Where, in proceedings to declare increased passenger rates invalid, the Public Service Commission neither found nor declared that the increased rates were unreasonable nor unjust, nor that they were unfair either to the public or to the relator, an order setting aside such rates and requiring the restoration of the lower rates previously existing, based entirely on the ground that the carrier had failed to overcome the presumption that the increase was unreasonable because it had operated for several years under the pre-existing lower rates, was erroneous.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 12, 14–20; Dec. Dig. § 10.*]

4. CARRIERS (§ 10*)—RATES—DETERMINATION—MERITS.

In proceedings before the Public Service Commission to annul increased passenger rates, adopted and enforced by a carrier in its commutation suburban service, the carrier was entitled to have the Commission pass on the reasonableness of the increased rates on the merits in accordance with the facts as they then existed, and it was improper for the Commission to

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

145 N.Y.S.—33

determine that the increased rates were unreasonable because the carrier had failed to show that the former rates, under which it had operated for a considerable period of time, were unremunerative.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 12, 14–20; Dec. Dig. § 10.*]

Howard, J., dissenting.

Certiorari by the People, on relation of the New York Central & Hudson River Railroad Company, against the Public Service Commission for the Second District of the State of New York and others to review proceedings of the Commission fixing rates and charges for commutation and other passenger tickets to be charged by the relator for three years from March 1, 1913, between the Grand Central Station in the City of New York and stations intermediate to and including Peekskill, N. Y., on its Hudson division, and between the Grand Central Station in the City of New York and stations intermediate to and including White Plains, N. Y., on the Harlem division. Order annulled and remanded.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Charles C. Paulding, of New York City (Robert E. Whalen, of Albany, of counsel), for relator.

Ledyard P. Hale, of Albany, for defendant Public Service Commission.

Joseph S. Wood, of Mt. Vernon, for intervener Fiske, as Mayor of Mt. Vernon.

Max Cohen, of Yonkers, for intervener Lennon, as Mayor of Yonkers.

LYON, J. This is a proceeding by certiorari to review the action of the New York State Public Service Commission, Second District, in establishing passenger rates between certain stations on the Hudson river and Harlem divisions of relator's railroad and its terminal station, known as the Grand Central terminal in New York City.

Pursuant to the provisions of chapter 425 of the Laws of 1903, the relator, since soon after the passage of that act, has been engaged in the work of building said terminal station, depressing its existing tracks, and constructing through tracks for a considerable distance northerly from its terminal station, and in changing its motive power from steam to electricity between its terminal station and Croton on its Hudson river division, a distance of 33.86 miles, and White Plains on its Harlem division, a distance of 22.39 miles, involving in all an expense to the relator, as stated by it, of upwards of $23,000,000.

On July 1, 1910, the relator increased its passenger rates on both the Hudson river and Harlem divisions, and within a few days thereafter complaints were made to the Public Service Commission on behalf of four stations, Mt. Vernon and White Plains on the Harlem division, Peekskill on the Hudson river division, and Yonkers on both divisions, that such rates were unjust and unreasonable and asking that such rates be reduced. In response to these complaints, the relator filed separate answers, and hearings were from time to time had by the Public Service Commission; the four complaints be-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ing heard together and determined under one order and with one opinion. On the 31st day of January, 1913, the Commission made its order reducing the rates of fare to those which existed July 1, 1907, as to the 18 stations on the Hudson river division from Ludlow to Peekskill, and as to 10 stations on the Harlem division from Williams Bridge to White Plains; such change to become effective March 1, 1913, and to continue in force for three years from that date.

The Commission having denied the application of the relator for a rehearing, it obtained a writ of certiorari, and the proceedings and order of the Public Service Commission have thus been brought before us for review. The relator bases its claim of right to an annulment of the order of the Public Service Commission upon three grounds: First. That the Commission was without jurisdiction to make an order reducing the rate of fare. Second. That the Commission erred in holding that the burden of proof was on the railroad company to justify the reasonableness of its advance July 1, 1910, of the rates which had been in existence since June 28, 1907. Third. That the rates established by the relator on July 1, 1910, were reasonable, and hence that the rates established by the Public Service Commission by its order of February 13, 1913, were unreasonable and unjust to the relator, and that the Commission did not find as a fact that the rates complained of were unjust or unreasonable.

[1] The question as to the jurisdiction of the Commission to make an order reducing rates is discussed by Justice Kellogg in his opinion in the case of People ex rel. New York, New Haven & Hartford Railroad Co., 145 N. Y. Supp. 503, decided by us at this term of court, in which authorities are cited and the conclusion reached that the Commission had the power to fix the rates in question. With such conclusion we fully concur, and hence there is no necessity for a further discussion of that subject, but it may be observed that section 57 of the Railroad Law (Consol. Laws, c. 49), fixing maximum rates of fare, is made subject to the provisions of the Public Service Commissions Law, which provides:

"Nothing in this section or in any other provision of law shall be deemed to limit the power of the Commission to require the sale of, and upon investigation prescribe reasonable and just fares as the maximum to be charged for, commutation, school or family commutation, * * * round-trip excursion tickets, or any other form of reduced rate passenger tickets." Subdivision 4, § 33, of the Public Service Commissions Law (Consol. Laws, c. 48), as amended by chapter 546, Laws of 1911.

Thus the Legislature, in fixing maximum fares to be charged for transportation, reserved the right to change the same or in specified instances or classes through the agency created by it for that purpose, which right the Legislature had not reserved in the act under consideration in the case of L. S. & M. S. Ry. Co. v. Smith, 173 U. S. 684, 19 Sup. Ct. 565, 43 L. Ed. 858.

[2] As to the second ground of error alleged by the relator, the record discloses the following conversation as occurring upon the opening of the hearing before the Commission:

"The Chairman: Now I suppose the complainants take the same position as in the New Haven cases. Relator's Attorney: I would like to ask what that position is. The Chairman: Why, in the first instance, you have increased a long established rate, which was established by your voluntary act, and the

burden of proof is upon you, so to speak, to show the reason for doing it, to justify that action. * * * The Chairman: This Commission has held that where a railroad company by its own voluntary act has established a rate and has continued it in use for a certain length of time so it was its established rate, not as a mere experiment trying how it would work, but it has acted upon them, and the public has acted upon them for a considerable length of time, that shows that presumptively it is a reasonable rate as against the public and as against the road, and when that road undertakes to increase the rate, the reasons being within the knowledge of the corporation which justify it, it devolves upon the corporation, in a hearing of this kind, to present those reasons: First, to show us that the increase they have made is a just and reasonable rate."

To this ruling the relator duly excepted.

That the burden of proof was upon the complainants and not upon the railroad company has been thus stated in the following cases:

"It must also be remembered that there is no presumption of wrong arising from a change of rate by a carrier. The presumption of honest intent and right conduct attends the action of carriers as well as it does the action of other corporations or individuals in their transactions in life. Undoubtedly when rates are changed the carrier making the change must, when properly called upon, be able to give a good reason therefor, but the mere fact that a rate has been raised carries with it no presumption that it was not rightfully done. Those presumptions of good faith and integrity, which have been recognized for ages as attending human action, have not been overthrown by any legislation in respect to common carriers." Interstate Commerce Commission v. Chicago G. W. Ry., 209 U. S. 108–119, 28 Sup. Ct. 493, 497 (52 L. Ed. 705).

"When the bills were filed, the carriers insisted that the order was the result of a mistake of law, in that the Commission held that the long maintenance of the 40-cent rate raised a presumption that it was reasonable, because the carriers had been earning a reasonable profit. But we need not consider whether, under such circumstances, the maintenance of the admittedly low rate raised any presumption of reasonableness, or, if so, whether it is not neutralized by the presumption of right conduct by the carrier as primary rate maker. 209 U. S. 108, 28 Sup. Ct. 493, 52 L. Ed. 705. For whatever influenced the Commission in restoring the rates to the Pembina line, as to which there is now no appeal, it is evident that as to points east of that line they did not act on any presumption that the old 40-cent rate was reasonable. On the contrary, they acted directly contrary to any such presumption, and, instead of maintaining the old rate, allowed a new and higher rate to St. Paul." Interstate Commerce Commission v. Union Pac. R. R., 222 U. S. 541–550, 32 Sup. Ct. 108, 112 (56 L. Ed. 308).

"It is to be noted with regard to these (rates) that, as the law then stood, the mere fact that they were increased by the company over what they had been previously creates no presumption that they were not fair and reasonable. * * * It is said, however, in the report of the Commission, that the Mobile & Pensacola rates had remained substantially unchanged for over 20 years, and that there was no evidence that they had not been compensatory. At the time this statement was made, the increased rates were in force, which were established in 1907, and not the old ones in existence before that. And it was the unreasonableness of these new rates which the complainants in the

proceedings had the burden of showing. There was no adverse presumption to be indulged, as we have seen, because of the increase. * * * Nor is a voluntary rate established to meet competition to be taken as the measure of what is reasonable. * * * And yet that in effect is just what the Commission did in suggesting in defense of the reduction and restoration which it undertook to make that the previous rates were not shown negatively not to have been compensatory. It was not incumbent on the railroad at that stage to make this out, but on the complainant to show that the rates as they stood were unjust and unreasonable." Louisville & N. R. R. v. Interstate Commerce Commission (Com. C.) 195 Fed. 541, 557–558.

Congress recognized the fact that, where the statute was silent, the burden of proof before the Interstate Commerce Commission as to the charge of excessive rates was upon the complainants, by enacting in 1910 a statute providing that the burden of proof should be upon the railroad company. 36 United States Statutes at L. p. 556, c. 309 (U. S. Comp. St. Supp. 1911, p. 1332).

The complaints instituting this proceeding alleged that the increase of rates of July, 1910, was unreasonable and unjust, and asked that the same be reduced to such sums as might be reasonable and just. As a general principle of law, the burden of proof is upon the party who, through the instrumentality of a proceeding which he has instituted, seeks to establish certain facts.

The burden of sustaining the affirmative of an issue involved in an action is upon the party alleging the facts constituting the issue. Heinemann v. Heard, 62 N. Y. 448.

It is an invariable rule that the burden of proof lies upon the plaintiff to establish his cause of action, and we know of no circumstance which excuses him from this obligation and imposes the duty upon the defendants of proving that the alleged cause of action did not exist. Meagley v. Hoyt, 125 N. Y. 771–772, 26 N. E. 719.

Every fact alleged in the complaint which plaintiff is required to prove in the first instance to make out his case, and which is put in issue, he is bound to prove by a preponderance of evidence. Farmers' L. & T. Co. v. Siefke, 144 N. Y. 354, 39 N. E. 358.

A party relying upon the establishment of a cause of action, or remedy against another, based upon wrongdoing, must show affirmatively facts and circumstances necessarily tending to establish a probability thereof. Shotwell v. Dixon, 163 N. Y. 43–52, 57 N. E. 178.

Very many other authorities might be cited to the effect that the burden of proof is upon the party complaining. There are certain exceptions to the rules, as where one relies upon an exception in the statute to take his case out of the rule laid down in the body of the statute itself. In such a case it lies upon the person insisting upon the exception to bring himself within it (Fleming v. People, 27 N. Y. 329; Hirshbach v. Ketchum, 5 App. Div. 324, 39 N. Y. Supp. 291; People v. Crotty, 22 App. Div. 77, 47 N. Y. Supp. 845); and where a guardian purchases land of his ward at a judicial sale, which purchase is by statute void, the burden is on the guardian to show that the purchase was for the benefit of the infant (O'Donoghue v. Boies, 159 N. Y. 87, 53 N. E. 537). An exception as to the burden of evidence at times exists where information is peculiarly within the knowledge of one party and not available to the other.

The ruling of the Commission that the burden of proof was upon the relator was made at the opening of the hearings in this proceeding in December, 1910, in the face of the conceded fact, known to the complainants and the members of the Commission, that the relator had been compelled to increase the wages of a large proportion of its employés; that the prices of certain materials and supplies necessarily used by it in the maintenance and operation of its railroad had materially advanced; and that practically every railroad entering New York City had increased its passenger rates under the claim that it could not operate its trains under the former rates excepting at a considerable loss.

While concededly the railroad company had possession of books and papers showing the receipts and expenses and other facts attending the operation of its railroad, yet the Commissioners were, by statute, given the power to examine all papers of the relator, to compel the production of sworn copies thereof, and to issue subpœnas to compel the attendance of persons and the production of books and papers. Public Service Commissions Law, §§ 45, 46. The latter section also provided that every railroad corporation should file an annual report in the form, and containing the information asked for by the Commission; that the Commission might also require such corporation to file periodic reports in the form covering the period and the time prescribed by the Commission; and that the Commission might also require, of any such corporation or person, specific answers to questions upon which the Commission might need information. The complaints filed with the Commission by the interveners, particularly that relating to the village of White Plains indicated that information as to many facts considered by the complainants, germane to the issues, were not confined to officers of the relator. From the record it appears that the relator furnished all the information requested which was within its power to furnish.

There is no provision of the New York Public Service Commissions Law which places the burden of proof upon the railroad company or takes proceedings before the Commission out from under the general rule. Yet in the case at bar, instead of holding that the burden of proof was upon the complainants, who alleged that the rates of fare were unreasonable and unjust, the Commission held that the burden of proof was upon the railroad company to prove affirmatively that the rates were not unreasonable and unjust. In its opinion accompanying the order, the Commission says:

"A rate (1) fixed and established as the voluntary act of the corporation itself, (2) which has been charged and collected by the corporation during a period of time sufficiently long to show that it is not a mere experiment, and has been the rate which the corporation charged and collected as a regular and settled rate, (3) which has been accepted by the public in its dealing with the corporation as just and reasonable, (4) along which business affected by the rate has prospered and increased, must, as against the corporation, be treated as presumptively just and reasonable. It is unreasonable to increase such a rate without a new state of facts which for some reason makes the old rate not justly and fairly remunerative to the corporation. Such facts, if they exist, are peculiarly within the knowledge of the corporation. A change having been made by it from a presumptively reasonable rate, the burden lies upon it in the first instance to overcome by evidence the presumption of fact that the increased rate is unreasonable. All of the foregoing conditions obtain in the present cases, except that numbered 3, with reference to

the New York Central. That company increased its commutation rates in the year 1907, and this increase has never been acquiesced in by the public as being just and reasonable."

It may also be observed that this conclusion assumed by the Commission numbered 4, to the effect that under the rates of 1907 the business affected by the rates had prospered, does not appear to be borne out by the evidence. In its opinion the Commission also says: "We think that the respondent corporations have not succeeded by the evidence and arguments presented by them in overcoming the presumption that the increases complained of were unjust and unreasonable."

Hence, had no evidence whatever been offered by any party to the controversy, the Commission must have considered it to be its duty to order a reduction in the rates, but the power to change rates was given to the Commission only when, after a hearing had the Commission should be of the opinion that the rates, fares, or charges demanded, exacted, charged, or collected by any railroad company are "unjust, unreasonable, * * * and then to determine the just and reasonable rates, fares, and charges to be thereafter observed and in force as the maximum to be charged." Public Service Commissions Law, § 49.

Under the Interstate Commerce Act, it has been held that a determination by the Commission that the rates were unjust and unreasonable is a statutory condition precedent to the exercises of the power to fix reasonable rates for the future (A., T. & S. F. Ry. Co. v. U. S. [Com. C.] 203 Fed. 56), and we think a similar condition precedent exists under the New York Public Service Commissions Law.

[3] The Commission made no findings whatever and probably was not required by law to make findings. Resort must therefore be had to the opinion of the Commission in order to determine the basis of its decision. Nowhere, either in the opinion or in the order, has the Commission declared that it has found the rates of 1910 to be unreasonable or unjust, or to be unfair to either the public or the relator, but the Commission has based its action ordering the rates of 1907 restored, upon the ground that the railroad company has failed to overcome the presumption that the increase of rates made by it in 1910 was unreasonable and unjust.

[4] We think the relator was entitled to have the determination of the Commission made upon the merits, and to be advised what in the opinion of the Commission were fair and reasonable rates, rather than to have the decision against it based upon the ground that, in the opinion of the Commission, the relator had failed to overcome the presumption of wrongdoing. It is in this view that we have considered the ruling of the Commission as to the burden of proof worthy of such extended consideration.

As to the third question involved, to wit, that the rates established by the relator July 1, 1910, were reasonable, and that the rates established by the order of the Public Service Commission were unreasonable and unjust, it is to be observed that the rates reduced by the Public Service Commission were those on the Hudson division relating to the 50-trip or family tickets, and the 60-trip or commutation tickets, and that the reduction upon the Harlem division related to the same two classes of tickets and also to the round-trip tickets. As to the 60-trip tickets, known as commutation tickets, a comparison of the rates allowed to be charged by the relator, as fixed by the Commission, with those in force in July, 1910, upon other railroads entering New York City, Yonkers on the Hudson river division, and Mt. Vernon on the Har-

lem division, being taken as furnishing distances most readily compared, shows the following results:

### Hudson River Division.

| N. Y. Cent. | Yonkers | 14.48 miles | $5 90 |
|---|---|---|---|
| D., L. & W. | Montclair | 14. | 6 20 |
| Erie | W. Orange | 13.8 | 6 35 |
| Penn. | Elizabeth | 14.1 | 6 50 |
| N. Y., Susq. & W. | Hackensack | 13.9 | 6 60 |

### Harlem Division.

| N. Y. Cent. | Mt. Vernon | 13.12 miles | $5 60 |
|---|---|---|---|
| Cent. of N. J. | El Mora | 13.5 | 6 15 |
| D., L. & W. | Orange | 13. | 6 20 |
| Erie | Clifton | 13. | 6 50 |
| " | Passaic | 12.4 | 6 25 |
| " | Montclair | 13.1 | 6 35 |
| " | Nutley | 13.4 | 6 20 |
| L. V. R. R. | West Elizabeth | 12.7 | 6 00 |
| N. J. & N. Y. | Hackensack | 13.5 | 6 50 |
| N. Y., Susq. & W. | " | 13.9 | 6 60 |
| Northern of N. J. | Nordhoff | 13.5 | 6 50 |

While the increased commutation rates of 1910 upon the Hudson river and Harlem divisions of the New York Central were in general slightly in excess of the average rates upon the other railroads named in the foregoing tables, yet the 1907 schedule, to which the Commission reduced relator's rates, were, as shown by these tables, far below the then rates of every other railroad. No good reason appears in the record why the relator was not entitled to receive practically the same compensation for carrying passengers the same distances. This conclusion seems to have been in the mind of the chairman of the Commission when he said to the complainants: "There is the first point that the Interstate Commerce Commission has practically affirmed the commutation rates on the West Shore road, which are identical in principle with those you complain of on the Harlem division."

The complainants refusing to accept such rates, the hearing proceeded. While the determination of the Interstate Commerce Commission was not binding upon the New York Public Service Commission in the matter of fixing the commutation rates to be charged by the relator, yet the then recent decision of the Interstate Commission in the case of the West Shore Railroad, operated by the New York Central, and of the other railroads, filed with the Public Service Commission at its hearing had in this proceeding in September, 1911, after an investigation of rates, is worthy of serious consideration as furnishing reliable evidence as to what were just and reasonable rates upon railroads entering New York City. While the commutation rates of 1910 were allowed to remain upon the interstate railroads, which included all the railroads mentioned in the foregoing table, excepting that of the relator, the relator's commutation rate was very materially reduced. This fact would of itself tend to indicate that the relator had some claim of right in its contention that the 1907 rates were unreasonably low, and would tend to controvert the presumption of wrongdoing upon the part of relator in advancing its 1907 rates. As to the evidence introduced by complainants, relating to commutation rates into cities in more or less remote parts of the country, such evidence can hardly be of much service in determining the rates which are just and reasonable as to relator's said divisions, in the absence of proof

as to the conditions and expenses under which such other railroads were operated. It is now 3½ years since this proceeding was instituted before the Public Service Commission. It is a matter of common knowledge that very recently a further increase of wages has been made and legislation had, which has materially increased the expense to relator of operating its trains. Also during this period the electrification of the suburban zone has been practically completed, and for a considerable time the relator has operated its trains over its Hudson river and Harlem divisions within such zone by electricity. This change of motive power may have resulted in very materially reducing the cost to relator of operating both divisions and justify a reduction of rates, but the results arising from electrification were more or less problematical at the time the hearings were had in this proceeding. The probable receipts and expenses of such future operation should now be capable of reasonably definite ascertainment. Furthermore, the evidence introduced at the hearings of the Commission related largely to the cost of operation as it existed in 1910, and not to the cost of operation as it was at the time the order was made in 1913. Whether the rates established in 1910 were then reasonable is not now so material as what are just and reasonable rates during the period for which the Commission has the power to fix the same. This court has not the power to fix rates. As was said by the United States Supreme Court in the case of Simpson v. Shepard, decided in June, 1913, reported 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, commonly known as Minnesota Rate Case: "The rate-making power is a legislative power and necessarily implies a range of legislative discretion. We do not sit as a board of revision to substitute our judgment for that of the Legislature, or of the Commission lawfully constituted by it, as to matters within the province of either."

It simply rests with the court to determine whether the record presented to it satisfactorily establishes the former rate to have been unreasonable and unjust, and the fixed rate to be reasonable and fair. The record in this proceeding does neither. It discloses no adjudication upon the merits as to what were the just and reasonable rates of fare. It must be held that upon all the evidence there was not such a preponderance of proof that the rates of 1910 were unreasonable and unjust, that the verdict of a jury, affirming such fact, rendered in an action in the Supreme Court, would not be set aside by the court as against the weight of evidence.

Upon another hearing the results of the operation of the railroad during the period since its practical completion should enable the Commission to intelligently determine the rates of fare as to the different classes of tickets, between the several stations and the city of New York, which will be just to both the passenger and the railroad company. Such portions of the present record as are material to the issues can be stipulated in evidence, leaving for the greater part to be supplied the experiences and results arising from the operation of the railroad during the past three years, and thus a speedy and comparatively inexpensive determination of the questions in dispute can be had. As the learned chairman of the Public Service Commission has stated in his opinion, the determination of the issues in this proceeding are important; and it is by reason of the importance of an order fixing the various rates of fare at 18 stations on the Hudson River Division, and 10 stations on the Harlem division of relator's railroad, that we have endeavored to give the voluminous record the careful consideration which its importance demanded.

Unquestionably, as the opinion also states, the rates of fare should be placed at the lowest point consistent with reason and fairness. This also means that the relator is entitled to be justly treated and to receive fair compensation for the service it renders. The disposition to fairness is the predomi-

nant trait of American character, and it may be unhesitatingly asserted that the great body of travelers desire the questions of rates disposed of fairly to both parties.

The order of the Commission must be annulled, but without costs, and without prejudice to a new application at any time.

JOHN M. KELLOGG, J. (concurring). I concur in the opinion of Justice LYON, except I would not favor a reversal of the order upon the ground that the Commission erred with regard to the burden of proof. The evidence was all received, and if the Commission acted upon it, and its decision rests upon a proper basis, aside from the question of burden of proof, I would not reverse for that error. But the record discloses that the Commission did not consider the vital questions and proceeded upon the wrong basis in making its order. The error as to the burden of proof was one of several which resulted in a mistrial. My views with reference to this hearing are given in the New Haven Case, decided at this term of court, and it is unnecessary to repeat them.

SMITH, P. J. (concurring). After reading the dissenting opinion herein I am led to add to my concurrence in the prevailing opinion a single word. My learned Associate is not alone in his desire to reach a righteous decision in disregard of technical error. There is not a judge on the bench who does not share his desire. In this day not one case in a hundred is decided on technical grounds. The criticism of the courts for their alleged reverence for technicality comes from those who fail to distinguish between technical and substantial error. This case presents a fair illustration. When a suitor comes into court for relief, he must prove that he is entitled to it. This is a substantial rule of law—not a technical rule. If one comes into court and asks a judgment restraining the conduct of another, he must prove that the other is violating his rights or threatens to. A defendant brought into court is not required in the first instance to prove his innocence before proof is made of his guilt. Now this rule of law is the rule as to the "burden of proof"; and it goes to the extent of holding that if a suitor fails to convince the court, by a fair preponderance of evidence, that his rights are being violated, he is entitled to no relief. I think no one will question the fairness or justice of this rule. It is not a rule of evidence which the courts are authorized to disregard. It is a rule of decision and fundamental. In the case at bar the prevailing opinion has demonstrated by authority that the complainants, in order to become entitled to an order reducing these fares, are required to prove that they are unfair. This is the same requirement made of every suitor in every court of the civilized world. Now the Commission has made this order without that proof. It has required respondents to reduce their rates without proof that those rates are discriminatory or unfair, but simply on the ground that the respondents have not proven that they are fair. In other words, a suitor had been granted relief without proof of the violation of his rights on the ground that the defendant has not proven its innocence. Can any thinking man call this a technical error? But my learned Associate says that notwithstanding this error of the Commission the evidence is all before the court, and this court, therefore, should make such a finding in support of the decision. I fully agree with him *if there be evidence in the record to warrant such a finding.* The Commission failed to find such evidence and make such a finding of fact. My learned Associate fails to discover such evidence and point it out. On the contrary, the prevailing opinion shows that the rates which the Commission required the respondent to reduce were already substantially the same as those of other sub-

urban lines entering New York, and that the rates required by the Commission are considerably below those rates which have been approved by the Interstate Commerce Commission. The claimants have not proven their case. For this reason the determination should be annulled.

WOODWARD, J., dissents, and votes for confirmation of the determination of the Public Service Commission.

HOWARD, J. (dissenting). According to a majority vote of this court, this important case, involving millions of people and millions of dollars, is about to turn largely, if not wholly, upon a technicality. This is contrary to the Code; it is contrary to the right.

The prevailing opinion says: "We think the relator was entitled to have the determination of the Commission made upon the merits, and to be advised what in the opinion of the Commission were fair and reasonable rates, rather than to have the decision against it based upon the ground that, in the opinion of the Commission, the relator had failed to overcome the presumption of wrongdoing. It is in this view that we have considered the ruling of the Commission as to the burden of proof worthy of such extended consideration."

But the case has been already heard and disposed of upon its merits. An enormous record was made before the Commission and is presented for our consideration; a record filled with facts, figures, tables, statistics, comparisons, and other data. Wherever the burden of proof may have rested, everything that could be produced was produced to establish the contention of each of the litigants. Of what consequence is it who produced it? Out of it all, the Commissioners failed to find evidence to convince them that the increased rates were reasonable, and this was the meat of the question before them; and this was the "merits" of the case. If this court is to reverse the findings of the Commission and make another long and expensive trial necessary, it should do so, not because a technical rule has been violated, but because the intrinsic right of the case is with the railroad instead of the complainants. The prevailing opinion also says: "There is no provision of the New York Public Service Commissions Law which places the burden of proof upon the railroad company or takes proceedings before the Commission out from under the general rule."

But it seems to me that my learned Associates have here again fallen into error, for section 20 of the Public Service Commissions Law says: "All hearings before a Commission or a commissioner, shall be governed by rules to be adopted and prescribed by the Commission. And in all investigations, inquiries or hearings the Commission, or a commissioner, shall not be bound by the technical rules of evidence."

This section not only authorizes the Commission to adopt rules of its own in trials before it, but it expressly commands that it "shall not be bound by the technical rules of evidence." Nothing could be more plain; nothing more sweeping. This does "take the proceedings before the Commission out from under the general rule." The Legislature recognizing that many of the technical rules of evidence were a hindrance to truth wiped them out of existence. In trials before the Public Service Commission, these antiquated rules are no longer to be reckoned with; they no longer blockade the highway to justice. I am aware that the language of this section can be narrowed down and completely emasculated by judicial construction; but this would be flying in the face of legislative reforms. This section of the Public Service Commissions Law binds us as much as it does the Commission, but, if there were no such section, we should not permit a rule of evidence to swerve us from the merits. A rule of evidence is a technicality; it is a law made by the judges;

when it operates to do wrong, to deny justice, to obstruct equity, it should be overridden by the courts and ignored. The courts sit not to reverence some ancient doctrine but to see that right prevails. It is not Stephen's Digest but the conscience of the court which should dominate in this case. The courts in recent times are under a constant fusillade of criticism; and much of it is merited. We have plenary power in this case and in every other case to do justice. The Legislature has recently given us unlimited permission to ignore technicalities and do what we think is right. The closing sentence of section 1317 of the Code of Civil Procedure, as amended in 1912 (Laws 1912, c. 380), reads: "After hearing the appeal, the court must give judgment, without regard to technical errors or defects or to exceptions which do not affect the substantial rights of the parties."

This emancipation of the courts from technicalities, rules, and precedents is broad, sweeping, and complete. Since the enactment of this statute, there is no excuse, except fallibility of judgment, to decide wrong. We can no longer lay the fault for a miscarriage of justice at the doors of the Legislature. But, notwithstanding this opportunity to shake off their ancient fetters, the courts seem prone to wear them. They seem unable to believe that these statutes mean what they say. The trend of decisions, construing section 1317, is to doubt the reality of this sweeping innovation. Legislative bodies of late are constantly untying the hands of the courts; but the judges have been so long shackled by rules which they themselves have made that they seem reluctant to be set at liberty.

Section 1317 of the Code, together with section 20 of the Public Service Commissions Law, arms us with ample authority to ignore all technicalities and decide this case on the merits; this we should do.